Bernard G. Brennan Co., an Illinois corporation v. Commissioner.
Bernard G. Brennan Co., an Illinois corp. v. Commissioner
Docket No. 448 PT.
United States Tax Court
1947 Tax Ct. Memo LEXIS 296; 6 T.C.M. (CCH) 195; T.C.M. (RIA) 47054; February 21, 1947
*296 During the period November 5, 1933 to April 14, 1934, petitioner, as a processor of hogs, paid a processing tax on the total amount of $406,418.02. Upon the evidence, held, petitioner bore the burden of such tax to the extent of $145,461.20, and is entitled to a refund of that amount. W. R. Brown, Esq., and W. Robert Brown, Esq., for the petitioner. Raymond F. Brown, Esq., and Irene F. Scott, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion This proceeding arose from the disallowance by the respondent of a claim for refund of processing tax paid by petitioner under the provisions of the Agricultural Adjustment Act, as amended, upon the processing of hogs. The original amount of the claim was for $397,698.23, but petitioner later filed an amended claim in which it claimed a refund of only $387,735.92 as representing the "Amount of burden of processing tax borne by claimant and not shifted to other persons." By registered letter dated July 12, 1943, the claim as amended was disallowed in full. In this letter the respondent stated in part that "An examination of the evidence submitted in support of your claim discloses that you have not established that you bore *297 the burden of the tax." The petition herein was filed pursuant to Title VII of the Revenue Act of 1936, as amended by section 510 of the Revenue Act of 1942. The amount of refund now claimed by petitioner is $244,624.75 The issue is whether petitioner bore the burden, in part, of the processing tax paid by it, and if so, to what extent it bore such burden. Some of the facts were stipulated. Findings of Fact The stipulation of facts is incorporated herein by reference. Portions of the stipulation will appear in the following paragraphs only in so far as they are specifically requested by the parties. The following numbered paragraphs correspond with the same numbers given by the parties in their requests for findings. Paragraphs numbered 1 to 18, inclusive, were requested by petitioner, and paragraphs numbered 19 to 31, inclusive, were requested by the respondent. These findings are made after considering the objections filed by each party to the requested findings of the other. 1. Petitioner is an Illinois corporation. During the period from October 1, 1931 to April 14, 1934, inclusive, petitioner's corporate name was Brennan Packing Co. and shortly thereafter its corporate name was *298 changed to Bernard G. Brennan Co. During the period from October 1, 1931 to April 15, 1934, petitioner was engaged in the business of slaughtering hogs and selling the hog products wholesale with its principal place of business in Chicago, Illinois. On April 15, 1934, petitioner discontinued business and proceeded to liquidate its assets and has not since engaged in any business. 2. For each month of the period from November 5, 1933 to April 14, 1934, inclusive, hereinafter sometimes referred to as the "tax" period, petitioner filed a "Monthly Return of Processor of Hogs" with the collector for the first district of Illinois and paid processing tax on hogs slaughtered for its own account; and in addition thereto in the months of January and February, 1934, paid a tax on the slaughtering of hogs by it for the Federal Surplus Relief Corporation for a charge or fee. The amounts paid by petitioner were as follows: Month of
Tax Applicable to
Tax Applicable
Total
Date of
Processing
Own Slaughter
to F.S.R.C.
Tax Paid
Payment
Nov. 1933
$ 18,723.09
$ 18,723.09
12/30/33
Dec. 1933
56,290.01
56,290.01
1/31/34
Jan. 1934
81,960.14
$13,563.00
95,523.14
3/ 1/34
Feb. 1934
86,046.70
26,843.70
112,890.40
4/ 2/34
Mar. 1934
119,581.63
119,581.63
4/30/34
Apr. 1934
43,816.45
43,816.45
6/ 1/34
Totals
$406,418.02
$40,406.70
$446,824.72
*299 The foregoing taxes paid for the tax period do not include a floor stocks tax in the amount of $82,129.39 paid by petitioner under section 16 of the Agricultural Adjustment Act upon its inventory of hog products on November 5, 1933. 3. Part of the processing tax payments applicable to petitioner's own hogs slaughtered have been recovered by petitioner by way of drawback refunds on articles exported, by way of invoicing such taxes to its customers on Board of Trade deliveries after November 5, 1933, under sales made prior thereto (Sec. 18, Agricultural Adjustment Act), and by way of invoicing such taxes to the Federal Surplus Relief Corporation on articles from petitioner's own processing sold thereto. The respective total amounts so received by petitioner are as follows: Drawback refunds on exports
$ 5,488.00
Tax invoiced to customers
8,184.00
Tax on sales of own articles to
F.S.R.C.
9,728.32
Total
$23,400.32
Part of the tax payments applicable to hogs slaughtered for the Federal Surplus Relief Corporation for a charge or fee were invoiced thereto in a total amount of $34,160.54. In addition to the foregoing recoveries by petitioner, certain of petitioner's vendees either exported or sold to *300 the Federal Surplus Relief Corporation articles processed by petitioner. Such vendees recovered a total amount thereon of $20,224, no part of which was returned to petitioner. 4. During the tax period petitioner purchased and slaughtered hogs (exclusive of processing for the Federal Surplus Relief Corporation for a charge or fee) with total number of head, total purchase weights, total net taxable pre-slaughter weights, and total costs for the respective periods as follows: Month of
No. of
Purchase
Pre-Slaughter
Processing
Head
Weight
Weight
Cost
Nov. 1933
14,659
3,863,535 Lbs.
3,744,618 Lbs.
$ 162,003.14
Dec. 1933
20,553
5,787,485
5,629,001
191,018.95
Jan. 1934
30,339
8,580,875
8,196,014
290,187.80
Feb. 1934
21,300
6,117,500
5,736,447
258,773.46
Mar. 1934
19,450
5,667,590
5,314,739
243,176.73
Apr. 1934
7,091
2,076,255
1,947,398
81,635.73
Totals
113,392
32,093,240 Lbs.
30,568,217 Lbs.
$1,226,795.81
During the months of January and February, 1934, petitioner slaughtered hogs for the Federal Surplus Relief Corporation for a charge or fee with total number of head, total purchase weights (tax paid on purchase weights without regard to shrink or condemnations), and total costs as follows: No. of
Purchase
Month
Head
Weight
Cost
Jan. 1934
7,197
1,356,300 Lbs.
$ 48,348.82
Feb. 1934
9,924
1,789,580
77,698.41
17,121
3,145,880 Lbs.
$126,047.23
The *301 cost of these hogs was paid by the Federal Surplus Relief Corporation and petitioner received a fee per head for slaughtering these hogs and in addition thereto was allowed to retain for its own use some of the parts of the hog carcass. The retained portion was a part of the fee. 5. During the tax period petitioner incurred certain expenses and costs included in which are such items as depreciation, storage, estimated expense and insurance, in processing for its own account, exclusive of any expenses and costs in processing for the Federal Surplus Relief Corporation for a charge or fee in total amounts and per cwt. unit (total amount divided by 305,682.17 units) as follows: Total Amounts
Per cwt. Unit
Hog Purchase Expense
$ 6,446.09
$.02109
Manufacturing Labor Costs
111,800.81
.36574
Manufacturing Plant Costs
134,456.47
.43986
During the same period petitioner also incurred sales, selling and other expenses, included in which are such items as freight, barrels, boxes, paper, tierces, cans, marine insurance and many other normal business expenses, in processing for its own account exclusive of any expenses and costs in processing for the Federal Surplus Relief Corporation for a charge or fee, *302 in total amounts and per cwt. unit (total amount divided by 305,682.17 units) as follows: Total Amounts
Per cwt. Unit
Sales Expenses
$16,408.64
$.05368
Selling Expenses
44,662.79
.14611
Other Expenses
37,540.98
.12281
6. During the period from November 5, 1931 to November 4, 1933, inclusive, hereinafter sometimes referred to as the "pretax" period, petitioner purchased and slaughtered hogs with total number of head, total purchase weights, total net pre-slaughter weights (purchase weight less 4.752 percent to adjust for shrink and condemnations per similar adjustment in the tax period), and total costs for the respective periods as follows: Month of
No. of
Purchase
Pre-Slaughter
Processing
Head
Weight
Weight
Cost
Nov. 1931
24,282
6,620,430 Lbs.
6,305,827 Lbs.
$ 313,232.98
Dec. 1931
31,219
8,614,100
8,204,758
362,731.93
Jan. 1932
34,310
9,706,410
9,245,161
379,128.42
Feb. 1932
28,986
8,377,200
7,979,115
316,178.95
Mar. 1932
29,730
8,597,170
8,188,632
363,313.95
Apr. 1932
26,870
7,620,550
7,258,421
287,492.42
May 1932
24,976
7,052,080
6,716,965
234,121.05
June 1932
26,878
7,722,870
7,355,879
279,316.90
July 1932
27,333
7,843,895
7,471,153
377,631.88
Aug. 1932
30,924
8,805,700
8,387,253
382,153.50
Sep. 1932
25,236
7,105,920
6,768,247
298,656.71
Oct. 1932
25,942
7,181,330
6,840,073
267,284.93
Nov. 1932
24,969
6,856,215
6,530,408
236,763.91
Dec. 1932
24,650
6,838,000
6,513,058
208,755.22
Jan. 1933
27,169
7,682,820
7,317,732
230,003.46
Feb. 1933
24,940
7,084,220
6,747,578
242,891.62
Mar. 1933
27,712
7,877,475
7,503,137
305,971.04
Apr. 1933
29,711
8,501,520
8,097,528
320,009.30
May 1933
36,135
10,162,950
9,680,007
465,824.39
June 1933
36,554
10,425,895
9,930,456
483,062.34
July 1933
34,364
9,774,605
9,310,116
451,417.46
Aug. 1933
27,178
7,809,130
7,438,040
322,799.48
Sep. 1933
24,135
7,028,755
6,694,749
291,713.26
Oct. 1933
25,783
7,519,600
7,162,269
335,582.15
Totals
679,986
192,808,840 Lbs.
183,646,562 Lbs.
$7,756,037.25
*303 Petitioner did no slaughtering of hogs for a charge or fee during the period November 5, 1931 to November 4, 1933, inclusive, and the above schedule covers all hogs slaughtered by petitioner for this period. 7. During the pre-tax period petitioner incurred certain expenses and costs included in which are such items as depreciation, storage, estimated expenses and insurance, in processing for its own account, in total amounts and per cwt. unit (total amount divided by 1,836,465.62 units) as follows: Total Amounts
Per cwt. Unit
Hog Purchase Expense
$ 31,938.35
$.01739
Manufacturing Labor Costs
552,860.79
.30105
Manufacturing Plant Costs
484,799.55
.26399
During the same period petitioner also incurred sales, selling and other expenses included in which are such items as freight, barrels, boxes, paper, tierces, cans, marine insurance and many other normal business expenses in processing for its own account, in total amounts and per cwt. unit (total amount divided by 1,836,463.62 units) as follows: Total Amounts
Per cwt. Unit
Sales Expenses
$ 82,661.59
$.04501
Selling Expenses
421,396.56
.22946
Other Expenses
193,811.72
.10554 8. During the tax period the gross sales value of all articles processed by petitioner *304 from the commodity for each of the months (or portions of months) within the period was, subject to six possible adjustments discussed in our opinion, as follows: November, 1933
$ 202,562.44
December, 1933
285,427.19
January, 1934
429,771.41
February, 1934
374,319.42
March, 1934
371,064.48
April, 1934
136,601.80
Total Gross Sales Value
$1,799,746.74
During the pre-tax period the gross sales value of all articles processed by petitioner from the commodity for each of the months (or portions of months) within the period was, subject to six possible adjustments discussed in our opinion, as follows: November, 1931
$ 403,662.19
December, 1931
470,762.29
January, 1932
476,246.95
February, 1932
390,623.80
March, 1932
436,498.95
April, 1932
375,587.95
May, 1932
297,191.57
June, 1932
329,532.54
July, 1932
408,578.29
August, 1932
466,685.37
September, 1932
373,632.12
October, 1932
335,290.55
November, 1932
296,710.24
December, 1932
253,766.38
January, 1933
297,995.08
February, 1933
271,155.61
March, 1933
328,500.95
April, 1933
378,656.85
May, 1933
500,421.63
June, 1933
557,860.44
July, 1933
530,890.08
August, 1933
$ 443,560.14
September, 1933
407,817.50
October, 1933
439,357.44
Total Gross Sales Value
$9,470,984.91 9. The findings here requested are consolidated *305 with paragraph 8 above. 10. Petitioner's final inventory of hog products was sold to Wilson & Co. Inc. (hereinafter sometimes referred to as Wilson & Co.) as of the close of business on April 14, 1934. The contract provided that the basic price was the fair cash market value of that date as though in final salable form and that, due to the further curing and handling expenses to be incurred by the buyer in placing such inventory in final salable form, an allowance should be made against this fair cash market value for these expenses thereby assumed by the buyer. This allowance amounted to $.25 per cwt. on the 8,718,356 pounds of meat included in the inventory or $21,795.89 and $.07 per cwt. on the 2,599,976 pounds of lard included in the inventory or $1,819.98, or a total allowance of $23,615.87. 11. Petitioner was not in the business of slaughtering hogs or dealing in hog products during the six months, February to July 1936, inclusive, hereinafter sometimes referred to as the "post-tax" period. 12. Petitioner concedes that if the recoveries of $5,488 and $8,184 mentioned in paragraph 3 above are to be included in the "sale prices current" as that term is used in section 907 (b) (6) *306 of the Revenue Act of 1936 then the total gross sales value of $1,799,746.74 set out in paragraph 8 above should be increased by the total amount of $11,405.53 as follows: November, 1933
$ 616.62
December, 1933
289.37
January, 1934
6,480.28
February, 1934
2,346.06
March, 1934
1,244.04
April, 1934
429.16
Total
$11,405.53
13. Petitioner sold prime steam lard both in the loose state and in tierces. During the tax period the percentage of tierced lard to total lard sales was 12.28 percent whereas during the pre-tax period it was 61.67 percent. In the case of the tierced lard sales the cost of the tierce was included as a part of the "sale prices current" as that term is used in section 907 (b) (6) of the Revenue Act of 1936. 14. Because of mistakes made on the cutting floor and bruises incurred in the handling of skinned hams, some of petitioner's skinned hams were graded as No. 2 skinned hams and sold for less than the No. 1 skinned hams. During the tax period the percentage of No. 2 skinned hams to total skinned hams was [*] percent whereas during the pretax period it was 20.18 percent. Petitioner included in its sale prices current the actual amount received for its skinned hams. The respondent contends *307 that the prices received for the No. 2 hams should be climinated from the sale prices current and that there should be substituted therefor a price which petitioner would have received if its No. 2 hams had in fact been No. 1 hams. Petitioner concedes that if this should be done, then the total gross sales values of $1,799,746.74 and $9,470,984.91 set out in paragraph 8 above should be increased by the total amounts of $9,464.60 and $30,999.21, respectively. 15. During January and February, 1934, petitioner sold some boiled and sweet pickled American cut hams that were not up to the standard in quality and included in its sale prices current the actual amount received therefor. The respondent contends that the prices received for such hams should be eliminated from the sale prices current and that there should be substituted therefor a price which petitioner would have received if such hams had in fact been up to the standard in quality. Petitioner concedes that if this should be done, then the total gross sales value of $1,799,746.74 for the tax period set out in paragraph 8 above should be increased by the total amount of $5,775.21 as follows: January, 1934
$3,809.05
February, 1934
1,966.16
Total
$5,775.21
16. *308 Relative to the hogs which petitioner slaughtered during January and February, 1934, for the Federal Surplus Relief Corporation for a charge or fee referred to in paragraph 4 above, petitioner was allowed to retain for its own use the lard, head and cheek meat, tongues, snouts, brains, ears, jowls, neck and back bones, tenderloins, tails, feet, livers, kidneys, hearts, stomachs, white grease, yellow grease, tankage and casings. The pre-slaughter weight of the parts thus retained (except casings) was 1,950.03 cwt. in January, 1934, and 2,864.09 cwt. in February, 1934, or a total preslaughter weight of 4,814.12 cwt. The gross sales value of the parts thus retained (except casings) was $9,726.43 in January, 1934, and $15,606.21 in February, 1934, or a total for the two months of $25,332.64. The gross sales value of the casings for both months was $1,712.10. No part of this gross sales value of the total amount of $27,044.74 is included in the total gross sales value of $1,799,746.74 set out in paragraph 8 above. The value of the above portions of the hog which petitioner was allowed to retain was a form of compensation which petitioner was allowed for slaughtering the hogs for a charge *309 or fee. It was not a part of the gross sales value to be used in the computation of the average margin for the tax period under section 907 (b) (1) of the Revenue Act of 1936. 17. During the pre-tax and tax periods petitioner processed and sold sweet pickled regular hams, sweet pickled skinned hams, boiled hams, sweet pickled American cut hams, sweet pickled picnics, sweet pickled and dry salt bellies, and dry salt fat backs and clear plates, all of various weights and sizes. In both sweet pickle and dry salt curing processes, the fresh weight placed in cure results in a final net realized selling weight slightly higher than the fresh weight thereof placed in cure. For articles placed in dry salt cure the average net selling weight derived therefrom was 103 percent of the fresh weight thereof placed in dry salt cure. For articles placed in sweet pickle cure the average net selling weight derived therefrom was 105 percent of the fresh weight thereof placed in sweet pickle cure. The average net selling weight of boiled hams was 58 percent of the fresh weight thereof placed in cure and thereafter boiled. Smoked products shrink in weight and the final salable weight of a smoked product *310 is less than the fresh weight thereof. The average time required for curing hams (sweet pickle cure) was 60 days during both the pre-tax and tax periods, and the average time required for curing picnics and bellies (sweet pickled or dry salt) was 30 days during both these periods. A ham is not salable as a cured ham (sweet pickled) until 60 days after it is placed in cure and fat backs, bellies, clear plates and picnics are not salable as cured products (either dry salt or sweet pickled) until 30 days after they are placed in cure. The respondent contends that because it took 30 days to cure articles other than hams and 60 days to cure hams, that, for the cured articles other than hams, petitioner must use the prices prevailing for the month following the month in which the hogs were slaughtered instead of the current prices for the month in which the hogs were slaughtered, and, that, for hams, petitioner must use the prices prevailing for two months following the month in which the hogs were slaughtered. If this contention is allowed, then the total gross sales values of $1,799,746.74 and $9,470,984.91 set out in paragraph 8 above, assuming that not any of the other "possible adjustments" *311 should be made to paragraph 8, should be increased and decreased, as follows: Month
Increased
Decreased
Tax Period: November, 1933
$ 530.07
December
3,335.33
January, 1934
29,756.76
February
7,532.48
March
10,441.41
April
No change
Total
$ 51,596.05
Pre-tax Period: November, 1931
$ 8,059.05
December
2,232.78
January, 1932
9,236.62
February
4,613.32
March
24,177.82
April
15,747.87
May
$ 7,918.78
June
17,771.10
July
7,421.90
August
28,355.23
September
14,616.17
October
19,915.98
November
13,001.44
December
22,010.15
Pre-tax Period: January, 1933
$ 5,450.19
February
$ 11,900.07
March
27,560.13
April
24,277.79
May
43,917.15
June
8,208.31
July
27,497.92
August
7,399.15
September
1,204.02
October
19,788.57
Totals
$170,985.38
$201,296.13
18. The findings here requested are consolidated with paragraph 8 above. 19. On March 26, 1934, the directors of petitioner met in special session and adopted a resolution, the material parts of which are as follows: WHEREAS, an offer has been received for the following assets of Brennan Packing Co.: The use of the name Brennan Packing Co., good will of the business, trade marks, brands, trade names, lots or parcels of land with the buildings and improvements thereon, right, title and interest in and to any switch tracks, *312 including leaseholds serving the premises of said Company, and the tracks, if any, and equipment for use thereon, automobiles, motor trucks, office furniture and fixtures, machinery, equipment and all supplies now on hand and all inventories of merchandise, including fresh meats, lard, meats in process of cure, cured meats, and ice, for a consideration deemed by the Directors to be adequate; and WHEREAS, there are other assets belonging to the Company which are not the subject of this sale and which assets shall be distributed immediately upon the sale of the assets abovenamed; NOW, THEREFORE, BE IT RESOLVED, that a special meeting of the shareholders of Brennan Packing Co. be called to meet on the 9th day of April, 1934, to consider and act upon the sale of the assets of said Brennan Packing Co., as hereinafter more fully described; and BE IT FURTHER RESOLVED, That the President and Secretary of this corporation be, and they are hereby authorized, instructed and directed to enter into, execute and deliver to Wilson and Co. Inc., a contract for the sale of certain of the assets of said Brennan Packing Co., contingent upon the acceptance and approval of the same by the shareholders *313 of Brennan Packing Co., at a special meeting of the shareholders to be called for the purpose of considering and acting upon the same, which contract is in words and figures as follows, towit: * * * The agreement between petitioner as "Seller" and Wilson & Co. as "Purchaser" was made and entered into on March 31, 1934. That part of the agreement dealing with the sale of petitioner's meat inventories, in so far as is here material is as follows: WITNESSETH, that the Seller agrees to sell and convey, and the Purchaser agrees to purchase, the following certain assets of the Brennan Packing Co.: * * *
Item 6. All inventories of merchandise, including fresh meats, lard, meats in process of cure and cured meats. Item 7. All inventories of supplies, including ice. The purchase price of the assets, described above as Items 1, 2, 3, 4, 5, of the Brennan Packing Co. shall be * * * ($525,000.00). The purchase price for said inventories of merchandlse described as Item 6 shall be the fair cash market value thereof at the close of business on April 14, 1934. * * *
The purchase price of said inventories of merchandise, described above as Item 6, shall be payable by one-third (1/3) of the estimated *314 value upon delivery of possession of said inventories at the close of business on April 14, 1934, one-third (1/3) of said estimated value on May 14, 1934, and the balance of the actual value on July 1, 1934. The actual value of said inventories of merchandise, described above as Item 6, shall be determined as hereinafter provided. * * *
Inventories of merchandise described above as Item 6, such as lard, pork and pork products, shall be valued at its fair cash market value at the close of business on April 14, 1934, whether or not it is ready for delivery in the ordinary course of business on that date, or whether a lapse of time, labor and expense is necessary to make it marketable in the ordinary course of business, and such valuations shall take into consideration the kind, grade, quality and condition of the product. The said inventories described above as Item 6 are to be valued at an appraised price to be agreed upon between representatives of the Seller and the Purchaser, and if they are unable to agree then each shall appoint an appralser. The two appraisers so appointed shall select a third and the decision of a majority of the appraisers shall be binding upon the parties hereto, *315 and the price fixed shall be the purchase price. * * *
If upon examination or shipment of said meats at any time prior to July 1, 1934, it is apparent that any of the product which is included in said inventory (item six) is not of the weight, sound cure, quality, cut or trim, average or grade at which it is taken in the inventory, the proper allowance shall be agreed upon and deducted from the balance of the purchase price of said inventory or, if the purchase price has been paid, the amount agreed upon shall be paid by the Seller to the Purchaser. The processing tax imposed by section nine of the Agricultural Administration Act, approved May 12, 1933, is included in the inventory price of the pork products described in item six herein. If the said tax on said inventories (item six) is abated, credited or refunded to the Seller, the price of the goods (item six) shall be abated, credited or refunded in like amount to the Purchaser as and when the same is received by the Seller from the United States Government; but in no event shall any portion of the purchase price of the items sold be withheld from the Seller by the Purchaser as security for the payment by the Seller to the Purchaser *316 of any abatement, credit or refund. * * *
This contract, on the part of the Seller, is contingent upon its acceptance and approval by the shareholders of the Brennan Packing Co. at a special meeting of said shareholders to be held in the City of Chicago, Illinois on April 9, 1934 and if the same is accepted and approved at said special meeting of the shareholders of said Brennan Packing Co. it will be taken and held to be a valid lawful and binding contract. The above-mentioned contract was accepted, assented to, endorsed, approved, ratified and confirmed by petitioner's stockholders at a special meeting thereof which was held on April 9, 1934. 20. The inventories sold by petitioner to Wilson & Co. contained the following number of pounds of the items indicated: Sweet pickle hams and picnics: Regular hams
1,342,693
Skinned hams
1,807,585
#2 Regular hams
100,888
#2 Skinned hams
264,618
#3 Hams
5,872
Retained hams
4,510
Sweet pickle picnics
147,705
3,673,871
Green frozen meat: Regular hams
57,608
Skinned hams
730,680
#2 Skinned hams
64,465
Picnics
175,785
1,028,538
Dry salt meat: A.C. bellies
2,928,889
#2 A.C. bellies
110,309
Rib bellies
297,058
Fat backs
373,845
#No. 2 Fat backs
495
3,710,596
Sweet pickle and green
frozen meat: Sweet pickle bellies
2,864
#2 Bellies
3,493
D.C. square cut bellies
1,232
Sweet pickle sterilized
tongues
1,200
Green square cut S. bellies
296,562
305,351
Total pounds of meat
8,718,356
Total pounds of fat
101,782
Total pounds of lard
2,599,976
Total pounds of grease and fertilizer
399,150
Total number of pounds in inventory
11,819,264
*317 21. The respondent's request that this Court find as facts the matter stated in his paragraph No. 21 is denied. 22. To some extent there is such a thing as a seasonable variation in the pork packing business. Receipts of live hogs through the summer months are much less than they are through the winter months. There are also differences in character as to the weight of the sows. The lighter weights are scrce in the summer. Usually during July and August there is a less desirable grade of hogs. As a general rule prices for hogs are lower in the winter months notwithstanding the quality is generally better. The price of the product usually follows the price of the hog. 23. Petitioner sold some of its articles under contracts, the contracts being entered into sometimes as much as 60 days before the date of delivery of the article. 24. Sales invoices are issued as of the date of delivery of the goods and not as of the contract date. 25. Petitioner sold some of its articles f.o.b. its plant, some of its articles "c.a.f.e." (cost and freight) and some of its products were exported "c.i.f." (cost, insurance and freight). Some of petitioner's articles were sold in boxes, tierces and barrels *318 and others were sold unboxed, untierced or unbarreled. The invoice price from which petitioner tabulated its sale prices current in each instance included the total charge for the product. Where the product was sold with freight prepaid, either domestically or for export, the charge for these items was included in the composite price. The same was true with respect to including the packaging costs in the boxed, tierced and barreled items. 26. The findings here requested are consolidated with paragraphs 5 and 7 above. 27 to 31, inclusive. The findings here requested are consolidated with paragraphs 14, 13, 12, 12 and 16, respectively, above. On the basis of the foregoing facts we find that petitioner bore the burden of the $406,418.02 processing tax paid by it to the extent of $145,461.20. Our reasons for this ultimate finding of fact will be more fully stated in the opinion which follows. Opinion BLACK, Judge: The issue in this proceeding, as previously stated, is whether petitioner bore the burden, in part, of the processing tax paid by it, and if so, to what extent it bore such burden. Petitioner does not contend that it bore the entire burden of the tax. The applicable statute is *319 Title VII (sections 901 to 917, inclusive) of the Revenue Act of 1936 as amended by section 510 of the Revenue Act of 1942, which statute was enacted as the result of the processing tax under the Agricultural Adjustment Act having been declared an unconstitutional levy by the Supreme Court in United States v. Butler, et al., 297 U.S. 1. Section 902 of the statute, as amended, provides that as a prerequisite to a refund of any amount paid as a tax under the Agricultural Adjustment Act, the claimant must establish that it bore the burden of the tax in whole or in part. Section 907 deals with evidence and presumptions, the pertinent provisions of which as far as the establishment of a prima-facie case is concerned, are in the margin.[1] *320 *321 *322 *323 Under subsection (a) it shall be primafacie evidence that the burden of the amount of the tax claimed as a refund was borne by the claimant to the extent "that the average margin per unit of the commodity processed was lower during the tax period than the average margin was during the period before and after the tax." The periods there referred to are defined in subsection (c). In the instant proceeding the "tax period" is the period from November 5, 1933 to April 14, 1934, inclusive; and the "period before and after the tax," hereinafter sometimes referred to as the "base" period, is the period from November 5, 1931 to November 4, 1933, inclusive, and the six months, February to July, 1936, inclusive. The "period before * * * the tax" is sometimes referred to herein as the "pre-tax" period; and the "period * * *324 * after the tax" is sometimes referred to herein as the "post-tax" period. Petitioner was not in business during the post-tax period, and of course it had no margins of its own during the post-tax period. Subsection (c) deals specifically with that situation and we will consider it later in this opinion. Under subsection (b) the "average margin" for the tax and base periods shall each be determined as provided therein. In making that determination there are four factors which must be established by the claimant, namely, (1) "the gross sales value of all articles processed"; (2) "the cost of the commodity processed"; (3) "the processing tax paid with respect thereto"; and (4) "the total number of units of the commodity processed." Numbers (1), (2) and (4) must be established for both the tax and base periods, with the exception, as stated in subsection (c), that if during any part of the base period "the claimant was not in business, or if his records for any part of such period are so inadequate as not to provide satisfactory data on prices paid for commodities purchased or prices received for articles sold, the average prices paid or received by representative concerns engaged in *325 a similar business and similarly circumstanced may with the approval of the Commissioner, where necessary for a fair comparison, be substituted in making the necessary computation." Number (3) is a factor applicable only to the tax period. After these four factors are established, the remaining part of the determination under subsection (b) consists merely of arithmetical computations to be made in the order therein provided. The parties have stipulated the second factor for the tax and pre-tax periods. See paragraphs 4 and 6 of our findings of fact. The third factor has also been stipulated. See paragraph 2 of our findings. For all practical purposes the fourth factor has likewise been stipulated for the tax and pre-tax periods. See paragraphs 4 and 6 of our findings relating to "pre-slaughter weight." The unit of commodity processed in the instant proceeding is 100 pounds of preslaughter weight of live hog. The only difference between the parties as to the fourth factor is in connection with the hogs slaughtered for the Federal Surplus Relief Corporation for a charge or fee during the months of January and February, 1934. See the last half of paragraph 4 and all of paragraph 16 of *326 our findings. We will consider this difference between the parties later in this opinion. The principal difference between the parties, as far as the establishment of a primafacie case is concerned, relates to the first factor, namely, "the gross sales value of all articles processed." Notwithstanding the enormous amount of evidence which was received in connection with the establishment of this factor, the respondent contends that petitioner has failed in its proof. As will appear later in this opinion we agree with the respondent that petitioner has failed to prove that such a factor was "necessary for a fair comparison" as far as the post-tax period is concerned, but we do not agree with the respondent that petitioner has failed to prove the gross sales value of all articles processed for the tax and pre-tax periods. See paragraph 8 of our findings. As set out in our footnote 1, supra, the term "gross sales value of articles" is defined in subsection (b) (6) as follows: The gross sales value of articles shall mean (a) the total of the quantity of each article derived from the commodity processed by the claimant during each month multiplied by (b) the claimant's sale prices current *327 at the time of processing for articles of similar grade and quality. The first step, therefore, in the determination of the gross sales value of articles is to determine the "quantity of each article derived from the commodity processed" as that term is used in the above definition. This "quantity of each article derived from the commodity processed" may, under subsection (b)(7), also set out in our footnote 1, supra, be either "actual" or "estimated." Petitioner elected to estimate and offered proof as to what the "estimated quantity" was. The respondent did not object to the quantity being estimated, for the statute provided that it could be, but offered other proof as to what the "estimated quantity" was. We think the proof offered by the respondent is more accurate than that offered by petitioner and petitioner has conceded that much in its brief. Therefore, in arriving at our findings in paragraph 8, we used the "estimated quantity" determined by the respondent and conceded to be correct by petitioner. The second step in the determination of the gross sales value of articles is to multiply this estimated quantity by "(b) the claimant's sale prices current at the time of processing *328 for articles of similar grade and quality." Subsection (b)(6), supra. The product of this multiplication is the gross sales value. The respondent contends, however, that petitioner has failed to prove the multiplier, namely, the matter stated in subsection (b)(6)(b), supra. We do not agree with the respondent as far as the tax and pre-tax periods are concerned. In this connection petitioner offered and we received in evidence (Exhibit No. 120) a complete transcript of all of petitioner's sales by weeks, during the tax and pre-tax periods of which petitioner has any record. This exhibit consists of approximately 802 separate sheets with each sheet having 18 columns and 50 lines. The contents of the exhibit were taken from 116 books, all of which were in the courtroom and identified at the hearing. Petitioner then rearranged all of these sales on separate weekly sheets, showing thereon the total sales for each of the separate articles. This rearrangement was received in evidence as Exhibit No. 127, and consists of approximately 124 large separate sheets. Petitioner then, in Exhibit No. 128, ascertained from Exhibit 127, as far as it was possible to do so, the selling price per pound *329 for each of the articles on a monthly basis. In several instances Exhibit 127 did not show any sales for certain of the articles, due either to the absence of any sales for a certain article in a certain month or the loss of certain of the books from which Exhibit 120 was taken. These instances were rare in comparison with the records which petitioner did have for the entire pre-tax and tax periods. In these instances, however, petitioner substituted other prices taken in part from a publication by the United States Department of Agriculture entitled "Prices of Hogs and Hog Products, 1905-1936 by Arthur T. Edinger, Associate Marketing Specialist" (Exhibit No. 132) and in part by averaging its own prices for the article immediately before and after the missing date. It then multiplied this selling price per pound for each of the articles by "the quantity of each article derived from the commodity processed" to arrive at the value per 100 pounds of purchase weight, which are the amounts shown in columns 4 and 8 of Exhibit 128. This exhibit consists of 90 separate sheets. Petitioner then added up the total of the value per 100 pounds of purchase weight for all of the articles on Exhibit *330 128, and on page 2 of Exhibit No. 129, multiplied this total for each month by the total purchase weight of hogs for each month to arrive at the "Gross Sales Value of Articles" for each month in the pre-tax and tax periods which it then used to compute the margins shown on page 1 of Exhibit 129. The respondent's agent examined and checked all of this material shown in Exhibits 120, 127, 128 and 129 and from this examination he prepared certain exhibits of his own which exhibits have been offered and received in evidence in this proceeding. In all of the exhibits prepared by the respondent's agent, he used as a starting point the same selling prices as petitioner had used. The exhibits prepared by the respondent's agent consisted of certain mathematical corrections, all of which have been accepted by petitioner in its brief, and certain other proposed adjustments some of which have been accepted by petitioner in its brief and some (six in number) of which have not been accepted by petitioner in its brief. Therefore, in arriving at our findings in paragraph 8, we have used as the multiplier in subsection (b)(6)(b) the "sale prices current" established by petitioner and as adjusted by *331 the respondent in so far as the respondent's adjustments have been accepted by petitioner in its brief. Our findings in paragraph 8 have been made "subject to six possible adjustments." These six possible adjustments are the proposed adjustments offered by the respondent which have not been accepted by petitioner in its brief and will be discussed later in this opinion. There is no necessity of discussing those adjustments proposed by the respondent which have been accepted by petitioner in its brief, for they have been given effect in our findings of fact. Before discussing the "six possible adjustments" above referred to, we will discuss a contention which the respondent has made at several places in his brief, which, if allowed, would prevent the finding we have made in paragraph 8, and which in itself would stand as a bar against any recovery whatsoever by petitioner for the reason that under this contention the respondent would demand a type of proof which petitioner is wholly unable to produce. Notwithstanding all the exhibits and other evidence offered by the respondent with a view of proving the "average margin for each period" (subsection (b)(3)), which exhibits used as a *332 starting point the same selling prices as petitioner had used, the respondent would now repudiate his own exhibits and argue that petitioner's evidence fails, all for the reason that petitioner's selling prices shown in Exhibit 120, for both the tax and pre-tax periods contained in some instances the cost of prepaid freight, insurance and the cost of wrapping or boxing or tiercing the particular article that was sold. Petitioner did not bill these items separately and petitioner's books from which Exhibit 120 was taken did not show any break-down of the selling price. The respondent contends that to permit such items as prepaid freight, insurance and cost of containers to be included as a part of the selling price of the separate articles cannot give an accurate margin computation for the articles of meat alone as more might be spent in one period for such items than was spent in the other period. Petitioner's books and records do not show how much of the selling price of each article of meat is due to any of these items of prepaid freight, insurance and cost of containers. Petitioner's records do show, however, how much it paid out in both periods for prepaid freight, insurance, cost *333 of containers and other costs of production, and contends that if such costs varied between the two periods, the proper place to show it would be by rebuttal evidence under section 907(e) after the prima-facie case had been established. We think petitioner is correct in this contention. In a general way all business concerns attempt to get back in their selling prices all of their costs and expenses and a little profit extra. If they did not accomplish this they could not remain in business. But in selling their product, they sell it for a given set price per article without stating that such price includes so much for cost of the raw material, so much for the cost of production and so much for profit. The buyer simply pays one price per article and that price is recorded on the seller's books as the selling price. That, we think, may be stated as the general rule. The items of prepaid freight, insurance and cost of containers were treated consistently in both periods. We think, if it is a fact that these items varied substantially between the two periods, that Congress intended that either party be permitted to show that variance by way of rebuttal evidence under section 907(e). In *334 Webre Steib Co. v. Commissioner, 324 U.S. 164, 33 AFTR 318, 322, the Supreme Court has held that the language in the statute "appears to mean that the presumption may be rebutted pro tanto." As will appear later in this opinion when we take up the rebuttal side of the case, variances have been shown and proper adjustments have been made therefor. It is, therefore, our opinion that the evidence in this proceeding fully justifies and requires the finding we have made in paragraph 8 of our findings of fact, subject of course to the six possible adjustments heretofore mentioned and which possible adjustments we will now consider. The first possible adjustment has to do with the "sale prices" (subsection (b)(6)(b)) that are to be used for the meat which petitioner cured. See our finding No. 17. The respondent contends that because it took 30 days to cure articles other than hams and 60 days to cure hams, that, for the cured articles other than hams, petitioner must use the prices prevailing for the month following the month in which the hogs were slaughtered instead of the "sale prices current" (subsection (b)(6)(b)) for the month in which the hogs were slaughtered, and, that, for hams, *335 petitioner must use the prices prevailing for two months following the month in which the hogs were slaughtered. We think this contention must be rejected as being contrary to the clear statutory directions for computing the gross sales value from "sales prices current at the time of processing for articles of similar grade and quality." The respondent's argument makes no attempt to show that his lag theory conforms to the statute. The respondent instead attempts to redefine the clear words "time of processing", which was the time of slaughter in the case of hogs, to cover the further time taken to complete the manufacture of the cured articles. Section 913 of the Revenue Act of 1936 expressly defines the "article" to be valued "at the time of processing" as follows: When used in this title - * * *
(d) The term "article" means the product which is obtained by processing a commodity, and includes the product obtained by further manufacture or by combination with other materials. The "product obtained by further manufacture" in the instant proceeding was cured meats. It is immaterial under the statute whether this manufacture took one, two or twelve months, the value to be placed thereon *336 is the "sale prices current at the time of processing" which means at the time the hog is slaughtered. The statute does not say that the quantity is to be multiplied by the sale prices existing one or two months after the time of processing but rather that it is to be "multiplied by (b) the claimant's sale prices current at the time of processing for articles of similar grade and quality." We hold that the adjustment contended for by the respondent under this heading should not be made. The second possible adjustment relates to the recoveries of $5,488 and $8,184 mentioned in paragraphs 3 and 12 of our findings. Petitioner paid a total amount of $406,418.02 processing tax on the slaughter of its own hogs processed during the tax period. A part of this payment has been recovered by petitioner and among the recovery classifications are drawback refunds or articles exported in the amount of $5,488, and by way of invoicing such taxes to its customers on Board of Trade deliveries made after November 5, 1933 under sales made prior thereto in the amount of $8,184. The respondent contends that these recoveries should be considered as a part of the selling prices in arriving at the gross sales *337 value of articles. He also contends that under the rebuttal provisions of the statute these same recoveries should be considered as "proof of the actual event to which the claimant shifted to others the burden of the processing tax." See section 907(e) of the Revenue Act of 1936 which provides in part: (c) Either the claimant or the Commissioner may rebut the presumption established by subsection (a) of this section by proof of the actual extent to which the claimant shifted to others the burden of the processing tax. Such proof may include * * *
(2) Proof that the claimant * * * at any time billed the tax as a separate item to any vendee * * *. It is obvious, we think, that an adjustment for these recoveries should not be made in the determination of the prima-facie case and again be considered as proof of the "actual extent" of the shift. To do so would give to these recoveries more weight than Congress intended. We think the statute clearly intended that such recoveries be considered under the rebuttal provisions of the statute. When properly considered under those provisions, as we have done later in this opinion, they show that the claimant did not bear the burden of the tax to *338 the extent of such recoveries. We hold, therefore, that these recoveries should not be considered as a part of the selling prices in arriving at the gross sales value of articles under subsection (b)(6) but that full effect shall and will be given thereto under subsection (e). It follows that no adjustment to paragraph 8 of our findings should be made on account of these recoveries. The third possible adjustment concerns the so-called No. 2 skinned hams. See paragraph 14 of our findings. As there stated the respondent contends that the prices received for the No. 2 hams should be eliminated from the sale prices current and that there should be substituted therefor a price which petitioner would have received if its No. 2 hams had in fact been No. 1 hams. This contention disregards actualities and we see no possible justification for it. We hold that the proposed adjustment should not be made. The fourth possible adjustment is the same in theory as the third. See paragraph 15 of our findings. We likewise hold that this proposed adjustment should not be made. The fifth possible adjustment concerns more than a possible adjustment to paragraph 8 of our findings. Paragraph 8 relates only *339 to the first of the four factors mentioned near the beginning of this opinion. Up to this point, before considering the fifth possible adjustment, petitioner's "average margin" for the tax period would be computed as follows: (1) Gross Sales Value (Par. 8 of Findings)
$1,799,746.74
(2) Cost of Commodity (Par. 4 of Findings)
1,226,795.81
(3) Processing Tax Paid (Par. 2 of Findings)
406,418.02
(4) Total cost and tax (2 plus 3)
1,633,213.83
(5) Margin (1 minus 4)
166,532.91
(6) Total number of units (Par. 4 of Findings)
305,682.17 cwt.
(7) Average margin per unit (5 divided by 6)
$ .54479 Under this fifth possible adjustment (see paragraph 16 of our findings) the respondent's contentions, if allowed, would change the above computation of petitioner's "average margin" for the tax period, as follows: (1) Gross Sales Value
$1,826,791.48 (An increase of $27,044.74)
(2) Cost of Commodity
1,226,795.81 (No change)
(3) Processing Tax Paid
412,664.18 (An increase of $ 6,246.16)
(4) Total cost and tax
1,639,459.99 (An increase of $ 6,246.16)
(5) Margin
187,331.49 (An increase of $20,798.58)
(6) Total number of cwt. units
308,893.79 (An increase of 3,211.62 cwt.)
(7) Average margin per unit
$ .60646 (An increase of $.06167)
The *340 increase of $27,044.74 represents the gross sales value of the articles which petitioner was allowed to retain for its own use (including casings) from the hogs which it slaughtered during the months of January and February, 1934, for the Federal Surplus Relief Corporation for a charge or fee. The increase of $6,246.16 represents that part of the $40,406.70 (paragraph 2 of findings) which petitioner did not invoice to the Federal Surplus Relief Corporation. The amount invoiced was $34,160.54 (paragraph 3 of findings). The increase of $20,798.58 is the difference between $27,044.74 and $6,246.16. The increase of 3,211.62 cwt. is the preslaughter weight of the retained articles, as contended for by the respondent. This amount does not appear in our findings for the reason that we have found from the evidence that the pre-slaughter weight of such retained articles is 4,814.12 cwt. as contended for by petitioner. The increase of $.06167 is the difference between $.60646 and $.54479. Petitioner contends that no adjustment of any kind should be made on account of the articles retained for the reasons that such articles were simply a part of the fee petitioner received for slaughtering the *341 hogs for the Federal Surplus Relief Corporation; that the tax paid thereon was not a "processing tax" as that term is defined in section 913 [2] *342 of the Revenue Act of 1936; and that, therefore, the factors relating to such articles have no bearing at all on the instant proceeding. In the alternative, petitioner contends that should it not prevail in its main contention regarding these retained articles, then the respondent's contentions on this point are still in error in that the respondent's contentions do not allow for the reduction of the cost in the amount of $19,386.44, [3] and that the number of cwt. units of such articles was 4,814.12 instead of 3,211.62. This alternative contention of petitioner, if considered and allowed, would change the above computation of petitioner's "average margin" for the tax period in petitioner's favor to the extent of $.00390 as follows: (1) Gross Sales Value
$1,826,791.48 (An increase of $27,044.74)
(2) Cost of Commodity
1,246,182.25 (An increase of $19,386.44)
(3) Processing Tax and "Tax" Paid
412,664.18 (An increase of $ 6,246.16)
(4) Total cost and taxes
1,658,846.43 (An increase of $25,632.60)
(5) Margin
167,945.05 (An increase of $ 1,412.14)
(6) Total number of cwt. units
310,496.29 (An increase of $ 4,814.12 cwt.)
(7) Average margin per unit
$ .54089 (A decrease of $.00390) We agree with petitioner's main contention that no adjustment of any kind should be made on *343 account of those retained articles. These hogs were purchased for the Federal Surplus Relief Corporation. They were paid for by the Federal Surplus Relief Corporation and petitioner slaughtered them for the Federal Surplus Relief Corporation "for a charge or fee." Petitioner has filed on P.T. Form 79 a "Claim for Refund of Processing Tax." The claim P.T. Form 79 carries the following printed footnote on page 1 of the form: The term "processing tax" means any tax or exaction denominated a "processing tax" under the Agricultural Adjustment Act, but shall not include any amount paid or collected as tax with respect to the processing of a commodity for a customer for a charge or fee. Any claim for refund of amounts paid as tax on the processing of that quantity of a commodity which was processed for a customer for a charge or fee shall be filed on P.T. Form 78. Section 906 dealt with the "Procedure on Claims for Refunds of Processing Taxes." This section set up the procedure before the old Processing Board of Review. Section 510 of the Revenue Act of 1942 abolished the Board of Review and transferred "the jurisdiction vested in said Board of Review" to the Tax Court. Petitioner's claim *344 is a claim for refund of "processing tax". Under section 913 (b), [4] it cannot include and petitioner makes no contention that it does include "any amount paid or collected as tax with respect to the processing of a commodity for a customer for a charge or fee." If it did include any such amount, we would not have jurisdiction, for any such amount of tax would not be a processing tax. Section 907 (b) (1) provides in part: * * * The margin for each such month shall be computed as follows: From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month and deduct the processing tax paid with respect thereto. It seems to us that the term "all articles processed" has reference only to all articles on which a processing tax is paid, for "the processing tax paid with respect thereto" is to be deducted from the gross sales value of the articles. The articles here in question, the gross sale value of which the respondent contends should be considered in determining the margin referred to in section 907 were from hogs slaughtered by petitioner for the Federal Surplus *345 Relief Corporation for a charge or fee. The tax paid with respect thereto is not a processing tax as that term is defined in the statute, and the "cost of the commodity" was not paid by petitioner but by the Federal Surplus Relief Corporation. Article 101 of Regulations 96 provides: Article 101. Definitions. - As used in these regulations - * * * (h) Custom processing tax. - The term "custom processing tax" means the amount paid under the Agricultural Adjustment Act as tax on the first domestic processing of that quantity of a commodity which was processed for a customer for a charge or fee. Examples: Milling of wheat for toll; slaughtering of hogs for a charge or fee. (i) Charge or fee for processing. - The term "charge or fee for processing" includes any form of compensation charged or taken by the processor for services rendered in processing a commodity for a customer. It would seem from the above definitions that the portions of the hog which petitioner "was allowed to retain" should be considered as a "form of compensation charged or taken by the processor for services rendered in processing a commodity for a customer" and should not be included in the computations of margins *346 under section 907. We so hold. It follows, therefore, that petitioner's "average margin" for the tax period up to this point is $.54479. It thus becomes unnecessary to consider petitioner's alternative contention with respect to this fifth possible adjustment. The sixth and last possible adjustment to paragraph 8 of our findings concerns only the four months in the pre-tax period of November and December 1931 and January and February 1932. The respondent in making his final computations of margin in Exhibit T simply eliminated these months entirely from his final computations for the apparent reason that the proof for these four months was the least satisfactory of all the months in the tax and pre-tax periods. We have already discussed this matter of proof and have held against the respondent as to his contention that petitioner has failed to prove the gross sales value of all articles processed for the tax and pre-tax periods, including the four months above mentioned. Exhibit T is the only exhibit offered by the respondent in which he proposed to exclude all figures for these months. In all of his other exhibits he used as a starting point the same selling prices as petitioner *347 has used, except for certain mathematical corrections, all of which have been accepted by petitioner in its brief. We have weighed all the evidence and we are satisfied that petitioner has proved the gross sales value of all articles processed by it for the four months now under consideration to be the values set out in paragraph 8 of our findings. Cf. Eugene H. Timanus, Receiver for Spencer Corporation v. Commissioner, 156 Fed. (2d) 744, wherein the Fourth Circuit, among other things, said: It is not our purpose to minimize the deficiencies of the taxpayer's records or to assume the function, entrusted exclusively to the Tax Court, to evaluate the evidence and make conclusive findings of fact. There is, however, room for the argument, if all the available figures are taken into account, that the loss in the whole business was so great as to indicate that the taxpayer absorbed the tax; and it may be possible for the trier of facts, despite the absence of precise figures, to make a determination, making adequate and proper allowances to offset the deficiency in the figures, so that the taxpayer will neither be unjustly enriched nor compelled to bear the burden of an invalid tax. In *348 some cases taxpayers have been permitted to use the Edinger's Tables completely in making the marginal computations. It would seem that petitioner's computations which are based almost entirely on its own selling prices as taken from its books are much more realistic than a computation based entirely on Edinger's Tables would be. All the statute requires is that a "fair comparison" be made. See subsection (c) in footnote 1, supra. We think that a "fair comparison" will be made if the values found in paragraph 8 of our findings are used. We hold, therefore, that the so-called sixth possible adjustment should not be made. We have shown that the "average margin" for the tax period is $.54479. Based upon our findings the "average margin" for the pre-tax period is $.93383 computed as follows: (1) Gross Sales Value (Paragraph 8 of Findings)
$9,470,984.91
(2) Cost of Commodity (Paragraph 6 of Findings)
7,756,037.25
(3) Margin (1 less 2)
1,714,947.66
(4) Total number of units (Par. 6 of Findings)
1,836,465.62 cwt.
(5) Average margin per unit (3 / 4)
$ .93383 Petitioner contends that it has also proven alleged factors for the post-tax period, namely, a "gross sales value" of $6,574,894.08, a "cost *349 of commodity" of $5,280,312.30, and a "total number of units" of 481,194.94 cwt.; and that when these alleged factors are added to the same factors for the pre-tax period, the result is an average margin per unit for the base period of $1.29852, determined as follows: Pre-tax Period
Post-tax Period
Base Period
(1) Gross Sales Value
$9,470,984.91
$6,574,894.08
$16,045,878.99
(2) Cost of Commodity
7,756,037.25
5,280,312.30
13,036,349.55
(3) Margin (1 less 2)
1,714,947.66
1,294,581.78
3,009,529.44
(4) Total number of units (cwt.)
1,836,465.62
481,194.94
2,317,660.56
(5) Average margin per unit (3 / 4)
$ .93383
$ .26903
$1.29852
We do not agree with petitioner that it has proven the alleged factors for the post-tax period or that such factors were "necessary for a fair comparison" as that phrase is used in subsection (c) set out in our footnote 1 above. Petitioner ceased business on April 14, 1934, which is more than 20 months prior to the beginning of the post-tax period mentioned in the statute. It seems to us that in a case of this kind any figures that might be determined for the post-tax period would have very little probative value in proving whether petitioner bore any of the processing tax which it *350 paid more than 20 months before the beginning of the post-tax period. Therefore, we do not think petitioner has shown that it is "necessary for a fair comparison" to have such figures. Furthermore, we think the figures used by petitioner here are too conjectural to be of any value in determining whether it bore any of the burden of the tax. It has not introduced any evidence of "average prices paid or received by representative concerns" as such. The gross sales values and cost used by petitioner here were taken from Edinger's Tables (Exhibit 132). Even if we might accept these tables as representing the "average prices paid or received by representative concerns" there is a further reason why we think the figures offered by petitioner are too conjectural to be of any value. That reason is the manner in which petitioner has arrived at the purchase weight for the post-tax period which it multiplies by the values taken from Edinger's Tables. It has taken as the purchase weight for the post-tax period the average of its own purchase weights for the six months of February to July of 1932 and 1933. All of this goes to show, we think, how unnecessary it is to have a computation for the post-tax *351 period in this case. It is, therefore, our opinion that petitioner has failed to prove the alleged factors for the post-tax period or that such factors were necessary for a fair comparison. That ends the prima-facie case. We hold that petitioner has established under subsection (a) set out in our footnote 1 above "that the average margin per unit of the commodity processed was lower during the tax period than the average margin was during the period before * * * the tax." It was $.38904 per unit lower ($.93383 minus $.54479). Therefore, "it shall be prima-facie evidence that the burden" of the $406,418.02 processing tax was borne by petitioner to the extent of $118,922.59 ($.38904 times the total number of units processed, namely, 305,682.17 cwt. units). We will now consider the rebuttal side of the case. The pertinent provisions of section 907 (e) of the Revenue Act of 1936 are in the margin. [5] *353 *354 Both parties have offered considerable evidence under subsection (e) some of which was stipulated. The facts found in paragraphs 3, 5, 7, 10, 13 and 19 to 25, inclusive, are based upon this rebuttal evidence. Although we have found in paragraphs 22, 23 and 24 certain facts requested by the *352 respondent, we do not regard such facts as rebutting in any way the prima-facie case established by the petitioner. We will now consider the effect of our findings in paragraphs 5, 7, 13 and 25. In that part of this opinion relating to the establishment of the prima-facie case we indicated that if the cost of the prepaid freight, insurance and containers (boxes and barrels for meat and tierces for lard) varied between the two periods, the proper place to show that variance was under subsection (e). That showing has been made and we have in the record a detailed cost of all these items. Petitioner contends, however, that it would not be fair to consider only a part of its costs and that if costs are to be considered all the costs of the business should be considered. This contention coincides with what the Fourth Circuit held in Eugene H. Timanus, Receiver for Spencer Corporation v. Commissioner, supra.In that case, among other things, the court said: * * * The decision of the Tax Court, as the Commissioner states in his brief in this court and as it appears to us, was based primarily on the correctness of the figures contained in the operating loss statement offered in evidence by the parties to the cause. Since the court made use of only a part of the figures we think that the *355 case should be remanded for further consideration so that all the costs of the business, and not merely the cost of manufacture, may be taken into account in reaching a determination. Since the costs varied in the two periods in the instant case, we think it is proper to consider the effect of this variance under subsection (e) and we agree with petitioner that in so doing, "all the costs of the business" should be considered. Eugene H. Timanus, Receiver for Spencer Corporation v. Commissioner, supra. See also Helvering v. E. Regensburg & Sons, 139 Fed. (2d) 883. Some of these costs increased during the tax period and others decreased. Our findings in paragraphs 5 and 7 show that during the tax period there was a net increase in costs per cwt. unit of $.18685, computed as follows: Tax
Pre-Tax
Costs
Period
Period
Increase
Decrease
Hog Purchase Expense
$ .02109
$ .01739
$ .00370
Manufacturing Labor Costs
.36574
.30105
.06469
Manufacturing Plant Costs
.43986
.26399
.17587
Sales Expenses
.05368
.04501
.00867
Selling Expenses
.14611
.22946
$ .08335
Other Expenses
.12281
.10554
.01727
Totals
$ .27020
$ .08335
Less Total Decrease
.08335
Net increase during tax period in costs per cwt. unit
$ .18685 Petitioner contends that *356 the net increase during the tax period in costs per cwt. unit was $.26411 instead of $.18685. It bases this contention on the facts that we have found in paragraph 10 of our findings. It argues that this allowance of $23,615.87 made to Wilson & Co. should be treated as a part of petitioner's costs of production during the tax period and that, therefore, the net increase in costs per cwt. unit should be increased from $.18685 to $.26411 an increase per cwt. unit of $.07726 ($23,615.87 divided by 305,682.17 units). We think petitioner's contention on this point should be denied. It did not pay out the $23,615.87 in question. It merely made an allowance to the purchaser in that amount to take care of the further curing and handling expenses to be incurred by the buyer in placing the inventory in final salable form. Such costs when incurred were the costs of Wilson & Co. and not the costs of petitioner. What is the effect of our finding that during the tax period there was a net increase in costs per cwt. unit of $.18685? We have previously found that the average margin per unit of the commodity processed was lower during the tax period than the average margin was during the pre-tax period. *357 It is our determination that this difference in average margin was due in part to the tax and in part to this net increase in costs. Subsection (e), supra, provides that "If the Commissioner determines that the difference in average margin was due in part to the tax and in part to the increase in other costs, he shall apportion the change in margin between them." We, therefore, hold that this difference in average margin should be apportioned between the tax and the net increase in costs. See E. W. Stockton, 44 B.T.A. 514. The amount of processing tax paid per cwt. unit was $1.32954 ($406,418.02 divided by 305,682.17 cwt. units). Under subsection (a) it was presumed that $.38904 of this tax was borne by petitioner and that the balance or $.94050 was shifted. Under subsection (e) (1) this presumption is rebutted to the extent that only 1.32954 (tax) of $.94050 1.51639 (tax plus net increased costs) or $.82461 was shifted to others. This leaves $.50493 ($1.32954 minus $.82461) of the tax as having been borne by petitioner which multiplied by the 305,682.17 cwt. units processed gives $154,348.10 as the total amount of tax borne by petitioner, subject, however, to the consideration *358 of the remaining rebuttal evidence, some of which was stipulated and some of which was offered by the respondent. We will next consider the effect of our findings in paragraph 3 the subject matter of which was stipulated. As shown in this finding, petitioner actually recovered $23,400.32 of the $406,418.02 "processing tax" which it paid on hogs slaughtered for its own account; $34,160.54 of the $40,406.70 "tax" which it paid on hogs slaughtered for the Federal Surplus Relief Corporation for a charge or fee; and in addition to such recoveries by petitioner certain of petitioner's vendees recovered $20,224, no part of which was returned to petitioner. It is our opinion that the effect of the recovery of $20,224 by petitioner's vendees merely acts as a limitation on the total amount that petitioner could recover in any event. In other words, it is our opinion that because of this recovery of $20,224 by petitioner's vendees, petitioner could in no event recover more than $386,194.02 ($406,418.02 minus $20,224). The limitation is due to section 911 which provides in part that: * * * No refund shall be made or allowed of any amount paid or collected as tax under the Agricultural Adjustment *359 Act, as amended and reenacted, to the extent that refund or credit with respect to such amount has been made to any person. The respondent's Regulations 96, Article 205, provides with respect to this provision of the Act in part that: * * * The claimant shall also submit a statement containing like data showing the refunds and credits which were made or allowed to persons other than the claimant with respect to amounts paid as tax by the claimant; such statement is required to be complete only to the extent that these data are shown by he claimant's records, or are otherwise within his knowledge. Regarding the recovery of $34,160.54, we do not think we are concerned with that recovery at all. That had to do with the slaughtering of hogs by petitioner for the Federal Surplus Relief Corporation for a charge or fee. Petitioner paid a total tax on such slaughtering of $40,406.70 and recovered $34,160.54. The $40,406.70 is not a "processing tax" within the definition of that term as defined in section 913 (b). See footnote 2, supra. Petitioner is not claiming in this proceeding a refund of any part of the $40,406.70. Therefore, we do not think we are concerned in this proceeding with *360 the $34,160.54 recovery. Regarding the total recovery of $23,400.32 of the $406,418.02 of "processing tax" which petitioner paid on hogs slaughtered for its own account, the parties apparently are in agreement that if the margins and rebuttal evidence show that petitioner has borne any part of the tax, the amount so shown as having been borne by petitioner must be reduced by the percentage that the total recovery bears to the total tax, which in the instant proceeding is 5.7577 percent ($406,418.02 divided by $23,400.32). Since in the instant proceeding the margins and rebuttal evidence up to this point show that petitioner has borne $154,348.10 of the $406,418.02 processing tax paid, it follows that under this apparent agreement of the parties the amount of $154,348.10 should be reduced by 5.7577 percent thereof, or $8,886.90, which leaves $145,461.20 as the amount of the burden borne by petitioner after effect has been given to paragraph 3 of our findings of fact. The theory of this reduction is that for each dollar of processing tax paid by petitioner, it has already recovered $.057577 thereof, and to allow petitioner to recover the full $154,348.10 would be permitting petitioner *361 to recover $8,886.90 twice. Petitioner in its brief concedes that this reduction should be made wherein it states that "Against this total burden borne by petitioner, a credit should be allowed to the extent that such recovery would otherwise duplicate the amounts previously recovered by petitioner." We will next consider the effect of our findings in paragraphs 19 and 20 and of our refusal to find as facts the matter requested by the respondent in his request No. 21. This request was properly objected to by petitioner and is as follows: (21) Treasury Decision 4425, which became effective March 20, 1934, shows the rate of tax applicable to the various articles in Table (d) thereof. The rate of tax shown in Table (d) of Treasury Decision 4425 applied to the pounds of articles which petitioner sold to Wilson & Co., Inc. in its inventory sale of April 14, 1934, results in a showing of tax of $379,699.34 applicable to this inventory. The computation of this amount is as follows: Rate of Tax
Pounds
Per Pound As
Amount of
Classification
Acquired T.D. 4425Per
Tax
Hams
Table (d)
Green Regulars
57,608
$ .0436
$ 2,511.71
S. P. Regulars
1,443,568
.0414
59,763.72
Green Skinned
727,247
.0492
35,780.55
Green Frozen Skinned
67,898
.0492
3,340.58
S. P. Skinned
2,072,203
.0461
95,528.56
B. R. & T. Hams
13
.0414
.54
#3 Hams
5,872
.0414
243.10
Retained Hams
4,510
.0414
186.71
Picnics
Green
175,785
.0171
3,005.92
Sweet Pickle
147,705
.0162
2,392.82
Bellies
Green S. C. S.
296,562
.0405
12,010.76
A. C. Dry Salt
3,010,983
.0279
84,006.43
Rib Dry Salt
291,058
.0279
8,120.52
D. S. A. C. Dry Salt
19,887
.0279
554.85
D. S. Rib Dry Salt
6,000
.0279
167.40
S. P. Sweet Pickle
6,357
.0384
244.11
D. C. Sq. Cut Sweet Pickle
1,232
.0384
47.31
D. C. Clear Dry Salt
8,328
.0279
232.35
Fat Backs
Dry Salt
374,340
.0195
7,299.63
Tongues
S. P. Sterilized
1,200
.0353
42.36
Lard
2,599,976
.0247
64,219.41
Grease
34,150
Fertilizer
365,000
Fat
101,782
11,819,264
$379,699.34
*362 The respondent contends that because of the paragraph in the contract which states that "The processing tax * * * is included in the inventory price of the pork products described in item six herein" we should find that a processing tax of $379,699.34 was included in the inventory price of the pork products which petitioner sold to Wilson & Co. under the contract dated March 31, 1934. This contention is unsound for several reasons. First, we must consider the entire contract. That is elementary. The contract also provided that "The purchase price of said inventories of merchandise described above as Item 6, shall be the fair cash market value thereof at the close of business on April 14, 1934." Therefore, the processing tax could be "included in the inventory price of the pork products described in item six herein" only if the "fair cash market value thereof at the close of business on April 14, 1934" was high enough to absorb the tax. The respondent has not proven that the latter was true. On the other hand, petitioner has shown that this was only partially true. Petitioner has shown by margin computations and by rebuttal evidence that it bore the burden of the tax to the extent of *363 $145,461.20. This means that $260,956.82 of the $406,418.02 was shifted to others by one means or another. We know that $23,400.32 of the $260,956.82 was in the form of direct recoveries. This would leave $237,556.50 that was apparently shifted by way of including it as a part of the selling price. Part of this shift was of course in the selling price of the inventory to Wilson & Co. But the respondent's request for a finding that $379,699.34 of processing tax was included in the inventory price to Wilson & Co. is without any sound foundation. As shown in his request for finding No. 21, the respondent arrived at this figure of $379,699.34 by applying the "Rates of compensating tax on articles or products processed wholly or in chief value from hogs, effective on and after March 1, 1934" as set out in Article 3 (d) of the regulations prescribed by T.D. 4425, Internal Revenue Cumulative Bulletin XIII-1, pages 459, 466, 471. The fallacy of using this table by the respondent lies in the fact that it is based on the assumption that the effective rate of processing tax on all articles was $2.25 per cwt., whereas on some of the articles included in the inventory sold to Wilson & Co. petitioner *364 did not pay any processing tax for it had processed them prior to November 5, 1933. On the articles processed during November 1933 (i.e. after November 4, 1933) petitioner paid a processing tax at the rate of 50 cents cwt. preslaughter weight; on the those processed during December 1933, $1.00; on those processed during January 1934, $1.00; on these processed during February 1934, $1.50; and on those processed during March and April 1934, $2.25 per cwt. To illustrate how inaccurate the respondent's computation in his requested finding No. 21 is we will take as an example the second item, namely, S. P. Regular Hams. The respondent has computed the "amount of tax" on these hams to be $59,763.72, whereas petitioner has correctly demonstrated in its brief that the processing tax paid on these hams could not exceed $10,650.17. There was no tax billed as a separate item in connection with the sale of this inventory. If any tax was shifted to Wilson & Co. it had to be included in the "fair cash market value thereof at the close of business on April 14, 1934." As a matter of fact this market price was reduced one-fourth of a cent per pound on all meats and 7 cents per cwt. on lard. If any *365 tax was included in the "fair cash market value thereof at the close of business on April 14, 1934" as thus reduced, we think it can best be shown by the margin computations and the rebuttal evidence which we have already considered and determined that petitioner bore the burden of the entire tax to the extent of $145,461.20. Finally, the respondent closes his argument with the following statement and citations: The respondent submits that the whole tenor of this case shows tax shifting. The invoices show some tax billed as a separate item, there are refunds of tax on articles exported by petitioner and sold by petitioner for charitable purposes, as well as refunds of tax to petitioner's vendees, and there is the specific statement that the inventories sold to Wilson & Co., Inc. included the processing tax. This would be sufficient evidence to overcome even a proper prima facie case in petitioner's favor. No such prima facie case exists here, but respondent submits that this evidence clearly overcomes any inferences that might otherwise be gathered from any figures in this case. See Webre Steib Co., Inc. v. Commissioner of Internal Revenue, supra; Commissioner of Internal Revenue v. Bain Peanut Co. of Texas, (C.C.A. 5th, 1943) 134 Fed. (2d) 853, *366 petition for certiorari dismissed on motion of petitioner; Franklin Peanut Co. v. Commissioner of Internal Revenue, (C.C.A. 4th, 1944) 144 Fed. (2d) 979, cert. denied (1945) 324 U.S. 867. If Commissioner v. Bain Peanut Co. of Texas, 134 Fed. (2d) 853, stood alone there might be some merit to the respondent's argument above quoted, but the Supreme Court has considerably restricted that decision in Webre Steib Co. v. Commissioner, supra. For instance in Bain Peanut the taxpayer had established a primafacie case by margins but because the Commissioner had shown in rebuttal "that the taxpayer adopted and followed a general practice of shifting the burden of the tax by billing the tax separately to its vendees and by increasing sales prices in every possible circumstance" the Fifth Circuit in holding that the presumption had been rebutted and completely dissolved said: * * * The uncontradicted evidence adduced by the Commissioner showed that this taxpayer actually did shift the burden of the tax; the presumption was rebutted; it was completely dissolved; and the burden reverted to the claimant to come forward with evidence or suffer judgment to be entered against it. The decision of *367 the Board being favorable to it on the basis of the presumption alone, respondent had no reason to present proof of the actual extent to which it bore the burden of the tax. Opportunity should be afforded the taxpayer to make such proof upon remand. The Fifth Circuit reiterated the principles of Bain Peanut in Commissioner v. Webre Steib Co., 140 Fed. (2d) 768. In this latter case the Processing Tax Board of Review had held that the taxpayer had made out a prima-facie case by margins to the extent of $3,655.82 of the $8,169.97 paid as processing tax; and that the taxpayer was entitled to a refund of $3,655.82. Upon the evidence before it the Board had "found that the claimant had participated in a universal increase in the selling price of sugar, effective as of the moment the processing tax was imposed, to cover the amount of the tax; and that claimant had collected from its vendees all taxes, for the entire period of the tax, assessed upon the processing of molasses, and all taxes for processing sugar during the year 1935." The Fifth Circuit in reversing and remanding the Board said: * * * We adhere to our ruling in the Bain Peanut Company case that the statutory presumption, when *368 rebutted, disappears entirely from the case; and if there is no proof aliunde the presumption, the taxpayer, upon whom the burden of proof lies, must suffer an adverse decision. Certiorari was granted in the Webre case and the Supreme Court speaking through Mr. Justice Jackson first laid down a rule which very much limited the Bain Peanut decision and which was as follows: * * * The statute declares, however, that the presumption may be rebutted by proof of "the actual extent" to which the burden of the tax was shifted. This language appears to mean that the presumption may be rebutted pro tanto, and not necessarily all at once or not at all. Thus it does not cease to operate on introduction of evidence merely sufficient to support a finding that some of the tax was shifted. It must be evidence sufficient to support a finding that the entire tax was shifted. Short of that, the presumption is not eliminated but only diminished to the extent that the rebuttal evidence will support a contradictory finding. * * * The Supreme Court then stated that "On the view we take of the statute, the proof introduced by the Commissioner made the presumption inoperative" and that: * * * More important, *369 the statute appears specifically to provide that introduction of any evidence of this particular kind shall be sufficient to rebut the entire presumption. It states that the presumption may be rebutted by proof that the claimant modified sales contracts to reflect the initiation, termination, or change in the amount of the tax, or "at any such time" changed the sale price of the article, or "at any time" billed the tax as a separate item, or indicated "by any writing" that the sale price included the amount of the tax. It then declares, "but the claimant may establish that such acts * * * do not represent his practice at other times." § 907 (e) (2). This seems clearly to mean that when any examples of the named practices are proved, it may be inferred that they represent the uniform practice of the claimant and the burden becomes his to prove that they do not. Since the Commissioner proved that not only in a few cases but in a great number the tax was indicated in writing to be included in the sale price, we think there is no doubt that he fully rebutted the presumption within the meaning of the statute. The Supreme Court then took up the question of what was the result of taking *370 the presumption out of the case. As to this it held that "the margin evidence remained in the case for whatever it might be worth apart from the presumption." It continued to discuss the effect of the difference in the margins of the base and tax periods in language partly as follows: * * * Congress apparently believed that the rational connection was strong enough to justify basing a finding of absorption on the margin evidence alone. For, as we have seen, Congress intended that in a case where the margins were favorable to the claimant and no other evidence was introduced the claimant should be entitled to a refund, and there appears no reason of convenience or policy which would lead to such a rule in the absence of rational connection. For all those reasons we think a finding of absorption which was based solely on the margin comparisons would not be irrational. The case was finally disposed of on the ground that although the presumption established by margins favorable to petitioner had been rebutted, the margins, as evidence, outweighed the proof offered by the Commissioner, and the taxpayer was given the refund of $3,655.82 originally determined by the Processing Tax Board of *371 Review. In the instant proceeding unlike the situation in the Webre Steib Co. case, the respondent has shown that only in a very few cases the tax was indicated in writing to be included in the sale price. In Webre Steib Co. that situation was shown to be present in a "great number" of cases. Because of this material difference in the facts we do not think the evidence offered by the respondent made the presumption inoperative. The provision in the Wilson contract that "The processing tax * * * is included in the inventory price" was by the very contract itself limited to the provision that "The purchase price of said inventories * * * shall be the fair cash market value * * *." If, however, we are wrong in this and the evidence be held to make the presumption inoperative, the margins are still in the case as evidence and must be duly considered. Webre Steib Co. v. Commissioner, supra.A tremendous amount of evidence has been submitted to establish the primafacie case and it should not be lightly considered. Webre Steib Co. v. Commissioner, supra; Eugene H. Timanus, Receiver for Spencer Corporation v. Commissioner, supra.Also petitioner has offered a considerable amount of *372 rebuttal evidence of its own, all of which has already been considered. If it should be held, contrary to our opinion, that the rebuttal evidence offered by the respondent makes the presumption inoperative, then it is our opinion, after a careful consideration of all of the evidence in the case, and we so find and hold, that the evidence offered by the petitioner outweighs that offered by the respondent and establishes by weight of proof that petitioner bore the burden of the tax to the extent of $145,461.20 and is entitled to a refund of processing tax in that amount. A decision will be entered that petitioner is entitled to a refund of processing tax in the amount of $145,461.20. Footnotes
1. SEC. 907. EVIDENCE AND PRESUMPTIONS. (a) Where the refund claimed is for an amount paid or collected as processing tax, as defined herein, it shall be prima-facie evidence that the burden of such amount was borne by the claimant to the extent (not to exceed the amount of the tax) that the average margin per unit of the commodity processed was lower during the tax period than the average margin was during the period before and after the tax. If the average margin during the tax period was not lower, it shall be prima-facie evidence that none of the burden of such amount was borne by the claimant but that it was shifted to others. (b) The average margin for the tax period and the average margin for the period before and after the tax shall each be determined as follows: (1) Tax Period. - The average margin for the tax period shall be the average of the margins for all months (or portions of months) within the tax period. The margin for each such month shall be computed as follows: From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month and deduct the processing tax paid with respect thereto. The sum so ascertained shall be divided by the total number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month. (2) Period Before and After the Tax. - The average margin for the period before and after the tax shall be the average of the margins for all months (or portions of months) within the period before and after the tax. The margin for each such month shall be computed as follows: From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month. The sum so ascertained shall be divided by the number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month. (3) Average Margin. - The average margin for each period shall be ascertained in the same manner as monthly margins under subdivisions (1) and (2), using total gross sales value, total cost of commodity processed, total processing tax paid, and total units of commodity processed, during such period. * * *
(5) Cost of Commodity. - The cost of commodity processed during each month shall be (a) the actual cost of the commodity processed if the accounting procedure of the claimant is based thereon, or (b) the product computed by multiplying the quantity of the commodity processed by the current prices at the time of processing for commodities of like quality and grade in the markets where the claimant customarily makes his purchases. (6) Gross Sales Value of Articles. - The gross sales value of articles shall mean (a) the total of the quantity of each article derived from the commodity processed by the claimant during each month multiplied by (b) the claimant's sale prices current at the time of processing for articles of similar grade and quality. (7) The quantity of each article derived from the commodity processed may be either (a) the actual quantity obtained, as shown by the records of the claimant, or (b) an estimated quantity computed by multiplying the quantity of commodity processed by appropriate conversion factors giving the quantity of articles customarily obtained from the processing of each unit of the commodity. (c) The "tax period" shall mean the period with respect to which the claimant actually paid the processing tax to a collector of internal revenue and shall end on the date with respect to which the last payment was made. The "period before and after the tax" shall mean the twenty-four months (except that in the case of tobacco it shall be the twelve months) immediately preceding the effective date of the processing tax, and the six months, February to July, 1936, inclusive. If during any part of such period the claimant was not in business, or if his records for any part of such period are so inadequate as not to provide satisfactory data on prices paid for commodities purchased or prices received for articles sold, the average prices paid or received by representative concerns engaged in a similar business and similarly circumstanced may with the approval of the Commissioner, where necessary for a fair comparison, be substituted in making the necessary computations. * * *
2. SEC. 913. DEFINITIONS. When used in this title - (a) The term "tax" means a tax or exaction denominated a "tax" under the Agricultural Adjustment Act, and shall include any penalty, addition to tax, additional tax, or interest applicable to such tax. (b) The term "processing tax" means any tax or exaction denominated a "processing tax" under the Agricultural Adjustment Act, but shall not include any amount paid or collected as tax with respect to the processing of a commodity for a customer for a charge or fee. ↩
3. Petitioner computes this cost of $19,386.44 as follows: From Paragraph 4 of our findings, which was stipulated, petitioner determines the cost per unit for January 1934 to be $3.56476 ($48,348.82 divided by 13,563.00 cwt. units), and the cost per unit for February 1934 to be $4.34171 ($77,698.41 divided by 17,895.80 units). It then multiplies this cost per unit by the number of units retained, and arrives at the total cost of $19,386.44, as follows: ↩
(1)
(2)
(3)
No. of Units
Cost Per Unit
Total Cost (1X2)
January, 1934
1,950.03 cwt.
$3.56476
$ 6,951.39
February, 1934
2,864.90
4.34171
12,435.05
$19,386.44
4. See footnote 2, supra.↩
5. SEC. 907. EVIDENCE AND PRESUMPTIONS. * * *
(e) Either the claimant or the Commissioner may rebut the presumption established by subsection (a) of this section by proof of the actual extent to which the claimant shifted to others the burden of the processing tax. Such proof may include, but shall not be limited to - (1) Proof that the difference or lack of difference between the average margin for the tax period and the average margin for the period before and after the tax was due to changes in factors other than the tax. Such factors shall include any clearly shown change (A) in the type or grade of article or commodity; or (B) in costs of production. If the claimant asserts that the burden of the tax was borne by him and the burden of any other increased costs was shifted to others, the Commissioner shall determine, from the effective dates of the imposition or termination of the tax and the effective date of other changes in costs as compared with the date of the changes in margin (when margins are computed for weeks, months, or other intervals between July 1, 1931, and August, 1936, in the manner specified in subsection (b)), and from the general experience of the industry, whether the tax or the increase in other costs was shifted to others. If the Commissioner determines that the difference in average margin was due in part to the tax and in part to the increase in other costs, he shall apportion the change in margin between them; (2) Proof that the claimant modified existing contracts of sale, or adopted a new form of contract of sale, to reflect the initiation, termination, or change in amount of the processing tax, or at any such time changed the sale price of the article (including the effect of a change in size, package, discount, terms, or any other merchandising practice) by substantially the amount of the tax or change therein, or at any time billed the tax as a separate item to any vendee, or indicated by any writing that the sale price included the amount of the tax, or contracted to refund any part of the sale price in the event of recovery of the tax or decision of its invalidity; but the claimant may establish that such acts were caused by factors other than the processing tax, or that they do not represent his practice, at other times. * * *